Robert V. Prongay (SBN 270796)
Lesley F. Portnoy (SBN 304851)
Pavithra Rajesh (SBN 323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

Matthew M. Houston
Benjamin I. Sachs-Michaels
**GLANCY PRONGAY & MURRAY LLP**
712 Fifth Avenue, 31st Floor
New York, NY 10019
Telephone: (212) 935-7400
Email: mhouston@glancylaw.com
        bsachsmichaels@glancylaw.com

*Attorneys for Plaintiff Thomas Mason*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS MASON, Derivatively on Behalf of Nominal Defendant RESTORATION ROBOTICS, INC., | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| RYAN RHODES, FREDERIC MOLL, JEFFREY BIRD, GIL KLIMAN, CRAIG TAYLOR, SHELLEY THUNEN, and EMMETT CUNNINGHAM, JR., | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| RESTORATION ROBOTICS, INC., a Delaware Corporation, | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Thomas Mason ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Restoration Robotics, Inc. ("Restoration Robotics" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, and violations of § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Restoration Robotics with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Restoration Robotics is a medical technology company.  The ARTAS System, the Company's sole product, is a robotic device that assists physicians in performing follicular unit extraction surgery.

2.      On October 16, 2017, the Company raised approximately $23.2 million through an initial public offering (the "IPO").

3.      The Registration Statement and Prospectus issued in connection with the IPO (collectively, the "Registration Statement") stated that the Company's salesforce would work directly with physicians to build their hair restoration practice and increase the number of procedures performed.  The Registration Statement claimed that the ARTAS System was more efficient and required fewer staff than traditional methods.  The Registration Statement also highlighted a new robotic implantation function under development by the Company which would allow the ARTAS System to implant harvested hair follicles.

4.      However, in disclosures less than six months after the IPO, the Company revealed that the number of procedures performed by physicians declined because the Company's salesforce was ineffective in generating patient leads and that the sales of systems fell as physicians delayed their purchase until the new robotic implantation functionality was available.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

5.      On this news, the Company's share price fell $0.62 per share, or more than 14%, to close at $3.68 per share on May 15, 2018, on unusually heavy volume.

6.      These revelations precipitated the filing of a securities class action in this District against Restoration Robotics and certain of defendants, *In re Restoration Robotics, Inc. Securities Litigation*, 5:18-cv-03712-EJD (the "Securities Class Action").   The Securities Class Action asserts claims against each of defendants

7.      At least half of the Company's current Board could not disinterestedly and independently respond to a litigation demand in connection with the misleading representations in the Registration Statements because, among other things, six of the seven current directors are defendants in claims pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (the "Securities Act").   Claims pursuant to Section 11 of the Securities Act do not require a showing of intent or scienter.   Accordingly, the six Restoration Robotics directors who are defendants in the Securities Class Action face a likelihood of liability in that action, and could not disinterestedly investigate whether their violations of Section 11 constituted breaches of fiduciary duties under Delaware law.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).   This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

**III.     PARTIES**

**Plaintiff**

10.     Plaintiff Thomas Mason purchased 6,993 shares of Restoration Robotics in September 2017 and has continuously owned his stock since that date.

**Nominal Defendant**

11.     Nominal Defendant Restoration Robotics is a Delaware corporation with its principal executive offices located at 128 Baytech Drive, San Jose CA 95134.  The Company's stock trades on the NASDAQ exchange under the symbol "HAIR."

**Defendants**

12.     Defendant Ryan Rhodes ("Rhodes") has served as director and Chief Executive Officer of the Company since 2016.  Rhodes signed the Registration Statement and is a defendant in the Securities Class Action.

13.     Defendant Frederic Moll ("Moll") has served as Chairman of the Board of directors of the Company since 2002.  Moll is a member of the Audit Committee.  Moll signed the Registration Statement and is a defendant in the Securities Class Action.

14.     Defendant Jeffrey Bird ("Bird") has served as a director of the Company since 2005.  Bird signed the Registration Statement and is a defendant in the Securities Class Action.

15.     Defendant Gil Kliman ("Kliman") has served as a director of the Company since 2007.  Kliman is a member of the Audit Committee.  Kliman signed the Registration Statement and is a defendant in the Securities Class Action.

16.     Defendant Craig Taylor ("Taylor") has served as a director of the Company since March 2017.  Taylor signed the Registration Statement and is a defendant in the Securities Class Action.

17.     Defendant Shelley Thunen ("Thunen") has served as a director of the Company since 2015.  Thunen is Chair of the Audit Committee.  Thunen signed the Registration Statement and is a defendant in the Securities Class Action.

18.    Defendant Emmett Cunningham Jr. ("Cunningham") served as a director of the Company from August 2011 to July 2018.  Cunningham signed the Registration Statement and is a defendant in the Securities Class Action.

19.    The defendants named in ¶¶ 12-18 are sometimes referred to hereinafter as the "Individual Defendants."

**Non-Party Director**

20.    Keith Sullivan ("Sullivan") has served as a director of the Company since July 2018.

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

21.    By reason of their positions as officers, directors, and/or fiduciaries of Restoration Robotics and because of their ability to control the business and corporate affairs of Restoration Robotics, at all relevant times, the Individual Defendants owed Restoration Robotics and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Restoration Robotics in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Restoration Robotics and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Restoration Robotics and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

22.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Restoration Robotics, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Restoration Robotics, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

23.    To discharge their duties, the officers and directors of Restoration Robotics were required to exercise reasonable and prudent supervision over the management, policies, practices

and controls of the Company.  By virtue of such duties, the officers and directors of Restoration Robotics were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c. Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

    d. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.  SUBSTANTIVE ALLEGATIONS

### A.  Background

24.  The ARTAS System, the Company's sole product, is a robotic device that assists physicians in performing follicular unit extraction surgery.  It consists of the ARTAS Hair Studio application, an interactive three-dimensional patient consultation tool that enables a physician to create a simulated hair transplant model for use in patient consultations; patient chair; cart, which includes the robotic arm; integrated vision system; artificial intelligence algorithms; and, a series of proprietary end effectors, which are the devices at the end of the robotic arm, such as the automated needle and punch, that interact with the patient's scalp and hair follicles.

25.  In April 2011, the ARTAS System was approved by the FDA for male patients diagnosed with androgenic alopecia who have black or brown straight hair.

26.  The Company's revenue is comprised of: (i) systems revenue derived from the sale of an ARTAS System; (ii) procedure-based revenue, as U.S. physicians must pay in advance on a

per follicle basis for the follicles to be harvested and on a per procedure basis for site making; and (iii) service-related fees, which are generated from post-warranty maintenance service and support contracts.

27.     Regional sales managers ("RSMs") coordinate and execute direct sales of the ARTAS Systems through marketing events and programs and by leveraging their relationships with dermatologists, plastic surgeons, and cosmetic aesthetic surgeons.  At the time of the IPO, the seven RSMs had an average of eight years of experience selling aesthetic capital equipment.

28.     Clinical training managers ("CTMs") train and educate physicians on the use of the ARTAS System and how to build their hair restoration practices.  CTMs provide product and procedure training, and the Company considers clinical confidence in the system and the procedure to be "key to adoption and utilization of the ARTAS System."  At the time of the IPO, the seven CTMs had an average of twelve years of experience in training physician practices in hair restoration or other aesthetic procedures and surgery.

29.     Practice success managers ("PSMs") help physician customers build awareness and market the procedure and increase brand awareness, including extensive training and coaching regarding the patient consultation process.  The Company's "PSMs work closely with the team that will manage the ARTAS business at the practice level to establish goals and develop detailed strategies to achieve these goals."  At the time of the IPO, the seven PSMs had an average of ten years of experience in developing hair restoration practices and aesthetics practices.

30.     In the United States, the Company relies on a direct salesforce of RSMs, CTMs, and PSMs that sell the ARTAS System and generate procedure-based revenue by helping physician customers build their hair restoration practice.

31.     Internationally, the Company sells ARTAS Systems to third party distributors who sell, service, and support the systems for physicians.  At the time of the IPO, the Company sold in twenty-nine countries through twenty one independent distributors.  The Company also had four sales personnel directly selling in nine countries.

32.     In October 2017, the Company completed its initial public offering.

**B.      Materially Adverse Trends that Existed at the Time of the IPO**

      **1.      The ARTAS System Was Cost-Prohibitive**

33.     The Company targets non-hair restoration specialists to sell ARTAS Systems, claiming the system offered "compelling economic benefits."  However, such physicians were often dissuaded by the significant initial investment of $250,000 to $300,000, which they found to be cost-prohibitive especially when the ARTAS System was not central to their practice.

34.     Moreover, physicians who made this investment were dissatisfied by the inefficiency and costs.  Upon information and belief, the Company's salesforce overstated the ease and costs associated with operating the ARTAS System.  For example, the salesforce claimed that the system could harvest an exceptional number of follicles per hour (i.e. 50 follicles over a 20 second period), but this was extrapolated from the system's performance in optimal conditions.  In reality, physicians spent three to five hours for an extraction and harvesting procedure. Additionally, the salesforce had claimed the system could be operated by one doctor and one nurse or technician, but procedures required three to four person team to operate effectively, which increased costs because physicians must hire independent contractors for $300 to $400 per procedure.

35.     Upon information and belief, the ARTAS system was slower and less efficient than the salesforce represented to physicians.  Non-hair restoration specialists were required to devote at least one to two full days per week for the patient consultations and procedures to recover their initial investment, and hair restoration specialists opted for manual restoration procedure because it is faster than the ARTAS System.

36.     Physicians were also dissuaded by the procedure-based costs.  For each surgery, physicians are required to pay $1.00 per follicle royalty to the Company such that the average surgery, which requires 2,000 hair follicles, resulted in a 13% to 20% royalty.  Upon information and belief, physicians must charge patients $10,000 to $15,000 to cover this royalty.

      **2.      The Company Provided Inadequate Support for Physicians**

37.     Upon information and belief, the Company's salesforce represented to physicians that they could recoup the cost of the machine within the first year using the high volume of

patient leads the Company generated from its significant investment in social media and digital marketing. The salesforce even provided a formula to show the customer's breakeven point on the initial investment using procedures on a per month basis.

38.    Upon information and belief, the Company did not have the steady stream of patient leads. PSMs, who received initial leads from the corporate office, would contact them to gauge their interest, but the prospective patients often asserted that they had never "signed up" for restoration services and had not heard of the Company.

39.    Upon information and belief, the Company relied on traditional methods of marketing and advertising, rather than digital marketing, but these methods failed to generate patient interest and were only effective among potential patients who were already at the physician's office.

40.    Upon information and belief, the PSMs were assigned to various widely dispersed geographic areas, which made it difficult for them to devote significant attention to physicians.

41.    Upon information and belief, physicians discontinued use of the system due to: (i) the lack of sufficient patient leads; (ii) the increased time and expense required for each procedure; and (iii) the lack of adequate training for physicians to develop the manual skills to implant follicles extracted by the ARTAS System. The resulting underutilization of the ARTAS System caused procedure revenue to lag further behind system revenue.

### 3.    Product Defects Caused Customers to Discontinue Use of the ARTAS System

42.    Upon information and belief, the needles provided in the Company's disposable kits damaged grafts during the extraction process. Every patient has a finite number of donor hair which is harvested by the ARTAS System during extraction, and physicians were promised yields exceeding 90%. However, the needles only yielded 50% of implantable follicles from donor hair.

43.    Upon information and belief, physicians, who were required to pay in advance for the total number of extracted follicles regardless of yield, were forced to pay almost double to extract sufficient implantable follicles. Moreover, these increased costs were passed to patients.

When physicians approached the Company for a response, the Individual Defendants caused Restoration Robotics to claim that user error, rather than faulty needles, caused the low yield.

44.     Upon information and belief, the ARTAS System suffered other product issues, such as software glitches and plastic components in disposable kits that were prone to failure.

45.     As a result of these product issues, physicians discontinued use of the product. Upon information and belief, thirteen doctors in a single region discontinued use in 2016, which represents 6% of global system sales by year-end 2016 and more than 17% of system sales in U.S. by mid-2017.

46.     Upon information and belief, Defendant Rhodes attended weekly sales meetings during which he crafted a "sales pitch" for the salesforce to recite verbatim, rather than reevaluating the sales strategy or addressing the patient lead and product issues.

### 4. Physicians Delayed Purchases of the ARTAS System in Anticipation of the Robotic Implantation Functionality

47.     The Company was developing a robotic implantation functionality, which was still in clinical development at the time of the IPO.  The Company expected to receive FDA approval in 2017 and to offer the enhanced system in 2018.

48.     Meanwhile, physicians refrained from purchasing the ARTAS System because it was unclear how the new functionality would be integrated with existing ARTAS Systems.

49.     Upon information and belief, Defendant Rhodes directed the salesforce to refrain from mentioning this implantation feature during sales pitches because it would delay sales or would require the Company to promise a free upgraded device.

### 5. ARTAS System Was Sold to International Distributors at a Discount

50.     Upon information and belief, ARTAS Systems were sold in large bulk orders to international distributors at the end of fiscal quarters to boost the Company's performance. Though the systems were shipped and revenue was recognized, the systems were not installed until several months later, if at all.

**C.     The Individual Defendants Caused the Company to Issue a Materially Misleading Registration Statement**

51.     On October 6, 2017, the Company filed its Registration Statement for the IPO with the SEC.  The Individual Defendants signed the Registration Statement.

52.     On October 13, 2017, the Company filed its final Prospectus with the SEC and went public.  In the IPO, the Company sold 3,575,000 shares of common stock to the public at $7.00 per share, raising $23.2 million net proceeds.

53.     According to the Registration Statement, customers were given "comprehensive clinical training, practice-based marketing support, as well as patient leads." Moreover, the Registration Statement claimed that the Company "sell[s] the ARTAS System, provide[s] service and generate[s] procedure based revenue by helping [its] physician customers build their hair restoration practice, through a direct sales force in the U.S. which, as of May 31, 2017, included seven . . . RSMs, seven CTMs and seven PSMs." Specifically, a PSM would help "build[] the physician-customer's hair restoration practice, [including] assisting with social media and digital marketing strategies," to increase the number of procedures performed.

54.     These statements in the Registration Statement were misleading because they: (i) misrepresented assistance provided by PSMs, who were actually geographically dispersed and lacked resources to devote sufficient time to physicians; (ii) misrepresented the marketing strategies to obtain patient leads because the Company relied on traditional, less effective methods such as brochures and posters; and (iii) misrepresented the success of PSMs and the effectiveness of marketing strategies to increase the number of procedures performed because the Company lacked a steady stream of patient leads to help physicians build their practices.

55.     To expand commercialization of the ARTAS System, the Registration Statement stated that the Company would "drive increased utilization of the ARTAS System by working collaboratively with [its] physician customers to increase the number of ARTAS procedures that are performed." Specifically, the Registration Statement stated, in relevant part:

> In addition, we believe we can increase procedure revenues by helping physicians build their practice through our marketing and training support. To achieve all of these goals, we intend to utilize our teams of clinical training managers, or CTMs,

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10

PSMs and field service engineers to work with and to support our physician customers in developing profitable ARTAS practices.

56.    These statements in the Registration Statement were misleading because they misrepresented the success of PSMs and the effectiveness of marketing strategies to increase the number of procedures performed because the Company lacked a steady stream of patient leads to help physicians build their practices.

57.    Regarding the role of PSMs, the Registration Statement stated, in relevant part:

Our PSMs are responsible for helping our physician customers build awareness and market the ARTAS procedure and increase ARTAS brand-awareness. Our PSMs average over ten years of experience in developing hair restoration practices and aesthetics practices. ***They form strong relationships with our customers and consult on how to integrate the ARTAS System into their practices, while raising awareness of the procedure among potential patients.*** This process often begins before the ARTAS System is installed at the customer site. ***Our PSMs work closely with the team that will manage the ARTAS business at the practice level to establish goals and develop detailed strategies to achieve these goals. This includes extensive training and coaching with respect to the patient consultation process. We provide easily implemented marketing tools allowing practices to create individually tailored website content, direct mail advertisements, print ads for magazines and newspapers and brochures.*** In addition, PSMs consult on methods to raise awareness of the ARTAS procedure through practice events, public relations, television, and radio advertising and other channels.

58.    These statements in the Registration Statement were misleading because they: (i) misrepresented assistance provided by PSMs, who were actually geographically dispersed and lacked resources to devote sufficient time to physicians; (ii) misrepresented the marketing strategies to obtain patient leads because the Company relied on traditional, less effective methods such as brochures and posters; and (iii) misrepresented the success of PSMs and the effectiveness of marketing strategies to increase the number of procedures performed because the Company lacked a steady stream of patient leads to help physicians build their practices.

59.    The Registration Statement claimed that the ARTAS System enables "physicians to perform hair restoration procedures with fewer staff required than a traditional strip surgery or a manual FUE procedure," which generally require "between four and eight technicians."

60.     These statements in the Registration Statement were misleading because they understated the number of staff members necessary to perform procedures using the ARTAS System.

61.     Regarding the needles used to harvest hair follicles, the Registration Statement stated, in relevant part:

> The needle travels at approximately 2,500 mm to 3,000 mm per second when it contacts the skin. ***This provides targeted precision and a cleanly scored incision.*** The punch then spins at 3,000 rpm and loosens the grafts from the surrounding tissue. In a clinical setting, we have observed that the dissection cycle takes between one to two seconds per graft, depending on the length of the graft. In a clinical setting, the ARTAS System has been shown to move from graft to graft at a rate of approximately one to three seconds, thereby enabling the ARTAS System to dissect a graft every two to five seconds, or approximately 720 to over 1,800 grafts per hour. The ARTAS System enables the physicians to adjust dissection parameters to accommodate for different types of skin, and manipulate graft selection algorithms based on patient needs. ***The ARTAS System can be programmed to dissect as many grafts as appropriate thus maximizing the use of the donor area. It can also be programmed to dissect grafts with more than two hairs each, thereby increasing the hair yield or the number of hairs per graft.***

(Emphasis added.)

62.     These statements in the Registration Statement were misleading because they misrepresented the efficiency and yield of the ARTAS System, as the needles suffered a defect that damaged the donor graft and lowered yield.

63.     The Registration Statement also highlighted "a robotic implantation functionality in clinical development which, if cleared for marketing, will enable the ARTAS System to implant harvested hair follicles."

64.     This statement in the Registration Statement was misleading because it misrepresented that physicians would delay their purchase of the ARTAS System as they awaited the new feature.

65.     According to the Registration Statement, the Company sold 89 ARTAS Systems in the U.S. and 144 internationally in the first half of fiscal 2017.  Furthermore, it claimed that "[d]uring the twelve months ended December 31, 2016, we sold 32 ARTAS Systems and, during

the six months ended June 30, 2017, we sold 27 additional systems representing an aggregate installed base growth of approximately 34% from December 31, 2015, or 174 to 233 systems."

66.    These statements in the Registration Statement were misleading because system sales were overstated using discounted sales to international distributors even though the systems had not been installed.

67.    According to the Registration Statement, as of December 31, 2016, the Company had sold 206 ARTAS Systems worldwide, generating $6.9 million in procedure based revenue, or $33,500 per installed system during that year.

68.    These statements in the Registration Statement were misleading because they failed to disclose that procedure based revenue was declining as physicians faced increased costs and less efficiency in performing procedures with the ARTAS System.

69.    Regarding revenue trends, the Registration Statement stated:

*We believe that revenue from procedure based fees has not grown proportionally with the increase in our installed base and varies from quarter-to-quarter due to a number factors, including*:

- physician uptake causing a slow ramp-up to utilizing the ARTAS System, which is particularly evident with physicians who are new to hair restoration procedures or physicians who do not operate a solely hair restoration focused practice who are commonly the profile we are targeting;

- capacity limitations with the current installed base of ARTAS Systems, which can result in procedure based fees not growing as quickly as system sales, as high performing practitioners are limited in the number of procedures that can be performed in any given period;

- *limited or no utilization of the ARTAS System after purchase as a result of a change in physician preference or practice*;

- the concentration of ARTAS procedures being performed on a limited number of ARTAS Systems leading to volatility between periods if particular high volume practitioners perform a smaller number of procedures in a given period which often happens during the summer period; and

- the number of procedures performed vary from quarter-to-quarter as the hair restoration industry is characterized by seasonally lower demand during the summer period when both physicians and prospective patients take vacations.

70.     These statements in the Registration Statement were misleading because they: (i) misrepresented all units sold as being part of the installed base even though ARTAS systems sold to third party distributors at a discount had not been installed; and (ii) attributed low utilization to physician preference rather than to the Company's own unsuccessful marketing efforts and to product defects with the ARTAS system.

**D.      The Truth Begins to Emerge**

71.     On January 5, 2018, the Company appointed Chris Aronson as Vice President of Global Sales, replacing Brent Nixon who had been with the Company since 2012.  The departure of a longtime executive overseeing international sales signaled issues facing the segment.

72.     On this news, the Company's share price fell $0.75 per share, or nearly 15%, over the course of six consecutive trading sessions to close at $4.41 on January 10, 2018.

73.     On March 5, 2018, the Company filed its annual report for the period ended December 31, 2017, in which it revealed its salesforce had shrunk to four RSMs, six CTMs, and five PSMs.

74.     On May 14, 2018, the Company announced its financial results for first quarter 2018 in a press release, disclosing that it only sold eight ARTAS Systems during the quarter.  It also reported $5.0 million revenue, compared to $5.5 million for the same period in 2017.

75.     The press release also revealed a shift to "a more U.S. centric strategy" which it characterized as "preparation for the launch of the implantation functionality expected before the end of 2018." However, this announcement masked the decline in international sales caused by the Company's undisclosed discounted sales to distributors: the Europe and Middle East market accounted for approximately 28% of total revenue in 2017, but had declined to 19% of first quarter 2018 revenue.

76.     The same day, the Company filed its quarterly report on Form 10-Q with the SEC, which reported approximately $2.4 million procedure-based revenue.  The report stated: "While revenue from procedure-based fees increased [year-over-year], the total number of procedures performed by our customers on their patients did not increase proportionally to our revenue from

1    procedure base fees due to the timing of when we sold the procedures to our customers versus

2    when procedures are utilized."

3          77.     On a conference call held May 14, 2018 to discuss these financial results, defendant

4    Rhodes revealed a significant investment to grow its sales force that would lead to some near-term

5    softness.  He stated, in relevant part:

6         Our U.S. team as of this call consists of seven regional sales managers to drive new
system placements, up from four as of our last call with an expectation to further
7         expand through the remainder of the year. We additionally have eight practice
success managers and one practice development leader focused on driving
8         utilization at the practice level. And last, we have six additional training managers.

9         Additionally, we've also expanded our inside sales team to respond to inquiries and
drive leads generated through various market initiatives to our customers. We are
10        continuing to add regional sales managers as this is one aspect of our plan to
enhance our commercial infrastructure as we pivot toward a U.S. centric sales
11        strategy to best position ourselves for a sustained growth.

12        In the near-term, we expect some level of softness as we further optimize and
expand our sales teams as the new U.S. sales reps take time to become more
13        productive.

14          78.     During the same call, defendant Rhodes also revealed "hesitancy from some of [the

15    Company's] physician customers to purchase new systems ahead of the availability of the

16    implantation functionality."

17          79.     On this news, the Company's share price fell $0.62 per share, or more than 14%, to

18    close at $3.68 per share on May 15, 2018, on unusually heavy volume.

19          80.     Following the disclosures on May 14, 2018, analysts issued reports expecting these

20    trends to continue.  Roth Capital Partners lowered its price target for the Company because "1Q18

21    system sales indicate[d] that buyers could be awaiting implantation" functionality and that the

22    system sales headwinds would continue into the second and third quarters of 2018.  Moreover,

23    Craig-Hallum Capital Group LLC attributed the earnings miss to "a lack of tenured reps, lighter

24    than expected EMEA [Europe, Middle East, and Africa] sales, and customers holding out for the

25    implantation feature."

26          81.     On July 30, 2018, during a conference call to discuss the Company's second

27    quarter 2018 financial results, defendant Rhodes stated that it had benefited "from a slightly larger

28    and more tenured salesforce, although [it] continue[s] to see customer hesitancy due to the

1   anticipated availability of the ARTAS iX system with implantation functionality that was recently

2   cleared by the FDA in March.

3       82.     On November 5, 2018, the Company announced its financial results for third

4   quarter 2018 in a press release, disclosing that revenue declined compared to the prior quarter to

5   $4.8 million.

6       83.     The same day, the Company filed its quarterly report on Form 10-Q with the SEC

7   for the period ended September 30, 2018.  Therein, the Company reported that procedure-based

8   revenue had fallen to $1.28 million because "customers purchas[ed] bulk procedures in prior

9   period and us[ed] them during in [sic] later quarterly periods." Therefore, the "total number of

10  procedures has not followed the increase in [the Company's] installed base of systems sold." The

11  report also revealed that sales in Europe and Middle East had declined to 8% of total revenue for

12  the quarter.

13      84.     On a conference call held the same day to discuss these results, the Company's

14  Chief Financial Officer reported that all systems sales were of the ARTAS iX.  He stated: "As far

15  as system sales go, we had eleven system sales, all of which were iX Systems.  Ten of the eleven

16  were in the U.S. and one was OUS."

17      85.     On this news, Roth Capital Partners again lowered its price target to $4 per share

18  because of the 24% decline in procedure sales to $1.3 million, well below expected $2.2 million.

19  Meanwhile, Maxim Group stated that the "3Q18 revenue miss was driven by lower-than-expected

20  procedure fees with headwinds expected to continue into 4Q18" and lowered its expected revenue.

21  **E.      The Individual Defendants Issued a Materially Misleading Proxy Statement to
            Solicit Stockholder Votes**

22

23      86.     On April 26, 2018, while defendants were concealing that misrepresentations in

    the Registration Statement, defendants Rhodes, Moll, Bird, Kliman, Taylor, Thunen, and

24  Cunningham Jr. issued a definitive proxy statement soliciting stockholder votes in advance of the

25  Company's annual meeting to be held June 13, 2018.  In the proxy statement, these seven

26  defendants solicited stockholder votes in favor of two management proposals including a proposal

27  to elect Bird and Kliman to new terms as directors.

28

87.     The proxy statement disclosed that the Board had determined that defendant Rhodes was not an independent director.  Regarding corporate governance, the proxy statement stated:

> Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through our board of directors as a whole, as well as through various standing committees of our board of directors that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure and our audit committee is responsible for overseeing our major financial risk exposures and the steps our management has taken to monitor and control these exposures.

88.     Furthermore, regarding risk oversight, the proxy statement stated:

> Management discusses strategic and operational risks at regular management meetings, and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the board of directors at regular board meetings as part of management presentations that focus on particular business functions, operations or strategies and presents the steps taken by management to mitigate or eliminate such risks.

89.     The proxy statement was materially misleading because it misrepresented the Board's actual activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties. A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

90.     On June 15, 2018, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2018 proxy statement.  In particular, Bird and Kliman were reelected to terms as directors.  The reelection of Bird and Kliman based on the misleading statements contained in the 2018 proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment of defendants at the expense of the Company's unaffiliated stockholders.

## VI.    DAMAGES TO THE COMPANY

91.     As a direct and proximate result of the Individual Defendants' conduct, Restoration Robotics has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.      Legal fees incurred in connection with the Securities Class Action;

b.      Any funds paid to settle the Securities Class Action; and

c.      Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Restoration Robotics.

92.     In addition, Restoration Robotics's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

93.     The actions complained of herein have irreparably damaged Restoration Robotics's corporate image and goodwill.  For at least the foreseeable future, Restoration Robotics will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Restoration Robotics's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

94.     Plaintiff brings this action derivatively in the right and for the benefit of Restoration Robotics to redress injuries suffered, and to be suffered, by Restoration Robotics as a direct result of breaches of fiduciary duty by the Individual Defendants, unjust enrichment, and violation of Section 14(a) of the Exchange Act.  Restoration Robotics is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

95.     Plaintiff will adequately and fairly represent the interests of Restoration Robotics in enforcing and prosecuting its rights.

96.     Plaintiff has continuously been a shareholder of Restoration Robotics at times relevant to the wrongdoing complained of and is a current Restoration Robotics shareholder.

97.     When this action was filed, Restoration Robotics's Board of Directors consisted of seven directors: defendants Rhodes, Moll, Bird, Kliman, Taylor, and Thunen, and non-party director Sullivan.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

**Defendant Rhodes**

98.     At all relevant times, Rhodes was the Company's CEO, and therefore was not independent under NASDAQ listing rules.  As an employee, Rhodes derives substantially all of his income from his employment with Restoration Robotics, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or his fellow members of management with whom he works on a day-to-day basis.  Moreover, as CEO, Rhodes knew of the declining sales of the ARTAS System, the Company's sole product.  Also, as alleged herein, Rhodes knew that the sales pitch given to physicians overstated the patient leads provided by the Company and that the prospect of a new implantation functionality delayed sales.  Rhodes personally issued the misleading statements and concealed the material facts described herein.  As a result, Rhodes would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

**Defendants Moll, Kliman, and Thunen**

99.     Moll, Kliman, and Thunen served as the members of the Audit Committee at all relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  As alleged herein, the Company's procedure based revenue is affected by the number of procedures performed by physicians, which in turn is affected by the effectiveness of the ARTAS System and the success of the Company's marketing efforts to obtain patient leads.  Moll, Kliman, and Thunen failed to ensure the integrity of the Company's internal controls, allowing the misleading statements to be disseminated in the Company's SEC filings and other disclosures.  Thus, Moll, Kliman, and Thunen breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Rhodes, Moll, Bird, Kliman, Taylor, and Thunen**

100.     Rhodes, Moll, Bird, Kliman, Taylor, and Thunen served on the board before the Company's IPO and knew of material adverse trends impacting the Company's sole product, the ARTAS System.  They signed the Registration Statement and knew that it omitted these material adverse trends.  As a result, Rhodes, Moll, Bird, Kliman, Taylor, and Thunen are defendants in the

1  Securities Class Action and face a substantial risk of liability.  As such they are not disinterested,

2  and demand is excused as to them.

3  101.    Further, Rhodes, Moll, Bird, Kliman, Taylor, and Thunen could not disinterestedly

4  consider a demand to action in connection with the misleading proxy statement issued in April

5  2018.  These six directors issued the proxy statement knowing that representations made in the

6  Registration Statement, which they had signed, were misleading and did not completely disclose

7  same prior to issuance of the proxy statement or the shareholder vote in June 2018.  Had these six

8  directors truthfully and completely revealed the misleading nature of the Registration Statement,

9  they would not have been reelected as directors.  As a result, Rhodes, Moll, Bird, Kliman, Taylor,

10  and Thunen would be interested in a demand regarding the misleading proxy statement, and

11  demand is excused as to them on that basis as well.

12  <u>**COUNT I**</u>

13  **Against the Individual Defendants for Breach of Fiduciary Duty**

14  102.    Plaintiff incorporates by reference and realleges each and every allegation

15  contained above, as though fully set forth herein.

16  103.    Each Individual Defendant owes and owed to the Company the duty to exercise

17  candor, good faith, and loyalty in the management and administration of Restoration Robotics's

18  business and affairs, particularly with respect to issues as fundamental as public disclosures.

19  104.    The Individual Defendants' conduct set forth herein was due to their intentional or

20  reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants

21  intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and

22  interests of Restoration Robotics.

23  105.    In breach of their fiduciary duties owed to Restoration Robotics, the Individual

24  Defendants willfully participated in and caused the Company to expend unnecessarily its corporate

25  funds, rendering them personally liable to the Company for breaching their fiduciary duties.

26  106.    In particular, the Individual Defendants knowingly or recklessly made untrue

27  statements and/or permitted the Company's public filings, disclosures, and statements to

28  misleadingly represent the demand for its core product, ARTAS System.

107.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Restoration Robotics has sustained and continues to sustain significant damages.  Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

108.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Restoration Robotics.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Restoration Robotics.

110.   Plaintiff, as a stockholder and representative of Restoration Robotics, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

111.   Plaintiff, on behalf of Restoration Robotics, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Violation of Section 14 of the Securities Exchange Act of 1934

112.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

113.   Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on

April 30, 2018 violated §14(a) and Rule 14a-9 because it misrepresented the Board's actual activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties, and it concealed that representations in the Registration Statement were misleading.

114.   In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

115.   The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The 2018 proxy statement solicited shareholder votes for: (i) director nominees; and (ii) ratification of the appointment of the Company's independent auditor.   The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

116.   The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of Restoration Robotics, demands judgment as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of Restoration Robotics and that Plaintiff is an adequate representative of the Company;

B.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.   Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Restoration Robotics

D.   Directing Restoration Robotics to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Restoration Robotics and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1      1.   a proposal to strengthen the Company's controls over financial reporting;

2      2.   a proposal to strengthen the Board's supervision of operations and develop and

3   implement procedures for greater stockholder input into the policies and guidelines of the Board;

4      3.   a proposal to strengthen Restoration Robotics's oversight of its disclosure

5   procedures;

6      4.   a provision to control insider transactions; and

7      5.   a provision to permit the stockholders of Restoration Robotics to nominate at least

8   three candidates for election to the Board;

9   E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and

10   state statutory provisions sued hereunder, including attaching, impounding, imposing a

11   constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their

12   other assets so as to assure that Plaintiff on behalf of Restoration Robotics has an effective

13   remedy;

14   F.      Awarding to Restoration Robotics restitution from defendants, and each of them,

15   and ordering disgorgement of all profits, benefits, and other compensation obtained by the

16   defendants;

17   G.      Awarding to Plaintiff the costs and disbursements of the action, including

18   reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

19   H.      Granting such other and further relief as the Court deems just and proper.

20   <u>**JURY DEMAND**</u>

21   Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury.

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

23

1  DATED:  July 11, 2019                    **GLANCY PRONGAY & MURRAY LLP**

2                                           By:  _Lesley F. Portnoy_

3                                           Robert V. Prongay
                                            Lesley F. Portnoy
4                                           Pavithra Rajesh
                                            1925 Century Park East, Suite 2100
5                                           Los Angeles, CA 90067
                                            Telephone: (310) 201-9150
6                                           Facsimile: (310) 201-9160
                                            Email: info@glancylaw.com
7

8                                           **GLANCY PRONGAY & MURRAY LLP**
                                            Matthew M. Houston
9                                           Benjamin I. Sachs-Michaels
                                            712 Fifth Avenue
10                                          New York, NY 10019
                                            Telephone: (212) 935-7400
11                                          Email: mhouston@glancylaw.com
                                                    bsachsmichaels@glancylaw.com
12

13                                          *Attorneys for Plaintiff Thomas Mason*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, Thomas Mason, do hereby verify that I am a holder of common stock of Restoration Robotics, Inc., and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 7/10/2019

DocuSigned by:

*Tom Mason*

4D3BDE01AAA640A...

Thomas Mason